**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LE BON BRUCE WALKER, et al. | * | |
|    Plaintiffs | * | |
| v. | * | Case No.: 06-CV-00603 |
| NEIL SELDMAN, et al. | * | |
|    Defendants | * | |

* * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

**COME NOW** Defendants, First American Title Insurance Company ("FATIC"), Eastern Market Real Estate ("Eastern Market"), Carolyn Davis ("Davis") and Eric Emrey ("Emrey") by and through Council, Baradel, Kosmerl & Nolan, P.A., Michael N. Russo, Jr., and Stephen A. Oberg, their attorneys, and hereby file this Motion to Dismiss or in the Alternative for Summary Judgment in the above-captioned matter as follows:

**I. Case Posture**

This action involves litigation between two members of Selker, LLC, ("Selker") formerly known as Seldman Walker, LLC. Among other things, Plaintiff Le Bon Bruce Walker ("Walker") is alleging that Defendant Neal Seldman ("Seldman") dissipated the assets of Selker while Walker was incarcerated. Specifically, in the instant action, Walker contends four (4) specific properties were improperly sold by Selker through Seldman as its manager. These properties are: 1350 Meridian Place, N.W., Washington, D.C.; 1964 2nd Street, N.W.,

Washington, D.C.; 503 Rhode Island Ave., N.W., Washington, D.C. and 1934 3rd Street, N.W., Washington, D.C.

Eastern Market is a title agent for FATIC that conducted the settlement of 1964 2nd Street from Seldman to Emrey and also the settlement of 503 Rhode Island Avenue from Selker to Andrew Steed ("Steed"). FATIC insured both transactions. At the time of the transfers Davis was an employee of Eastern Market.

This action was filed in this Court by the Plaintiff, pro se, and is identical to the case of Walker v. Seldman, Civil Action No. 04ca4631 (RP), currently pending in the Superior Court for the District of Columbia, in which Walker is represented by an attorney.[1]

## II. Argument

Plaintiff's Second Amended Complaint makes various claims with respect to the management of Selker. Specifically, it is alleged that the company was managed first by Walker, then by Seldman and possibly, later again by Walker. According to Walker the operation and management of the company impacted the validity of the transactions in question, including the sale of 1964 2nd Street from Selker to Seldman and then from Seldman to Emrey and also the sale of 503 Rhode Island Avenue from Selker to Steed. A review of these transactions within the context of various corporate actions within Selker is dispositive of the overarching issue in this case with respect to Defendants FATIC, Eastern Market, Davis and Emrey. Walker is not entitled to any relief on the substance of his claim with respect to these Defendants:

The actions and supporting documentation are as follows:

---

[1] On July 7, 2004, in Walker v. Seldman, Civil Action No. 04ca4631 (RP) the Defendants filed nearly an identical Motion to Dismiss or in the Alternative for Summary Judgment to that which is presented herein. That Motion was ultimately argued before Judge Terrell in September 2005 and a decision has not yet been rendered.

| Date | Document[2] |
|---|---|
| 06/07/2000 | **Operating Agreement establishing Seldman Walker, LLC.** This Agreement, at paragraph 1, provides that it is the business of the LLC to purchase, restore and develop investment properties in the District of Columbia. Further, at paragraph 7, the Agreement provides that the operations of the LLC may be managed by a manager appointed through a majority vote of the members. |
| 06/18/2001 | **Amendment to Operating Agreement.** This Amendment provides, in relevant part, that the management of the day-to-day operations of the LLC shall be transferred from Walker to Seldman and that the ownership of the LLC shall from that point forward be maintained 50 percent by Walker and 50 percent by Seldman. |
| 03/18/2002 | **DC Government Corporate Records.** This document shows the name change of Seldman Walker, LLC to Selker, LLC which occurred on November 7, 2000. |
| 03/18/2002 | **DC Good Standing Certificate.** Showing that Selker, LLC was in good standing. |
| 03/18/2002 | **Deed.** Showing the sale of the 1964 2nd Street property from Selker, LLC, by its manager, Neil Seldman, to Neil Seldman, individually. |
| 03/22/2002 | **HUD-l Settlement Sheet and Deed.** Showing the sale of the 503 Rhode Island Avenue, N.E., property from Selker, LLC, by its manager, Neil Seldman, to Andrew L. Steed. |
| 06/14/2002 | **Deed.** Showing the sale of 1964 2nd Street from Neil Seldman, the manager of Selker, LLC, to Eric Emrey. |
| 12/04/2003 | **Letter from Walker to Seldman** (attached to Second Amended Complaint as Exhibit 2) showing Walker's admission and acknowledgement that Seldman was, up to that time, the manager of Selker, LLC, and purporting to remove Seldman from that role within twenty (20) days from the date of that letter or by December 24, 2003. |

---

[2] The first 7 documents are offered through the Affidavit of Carolyn Davis, which is attached hereto as Exhibit 1. The last document, the December 4, 2003 letter from Walker to Seldman, is appended as Exhibit 2 to the Plaintiff's Second Amended Complaint.

The documents set forth above exhibit the manifest management of Selker, LLC, on March 18, 2002, the date of the transfer of 1964 2nd Street from Selker to Seldman and also on March 22, 2002, the date of transfer of 503 Rhode Island Avenue from Selker to Steed.

At the time of the transfer of 503 Rhode Island Avenue and 1964 2nd Street Seldman was the manager of the day-to-day operations of Selker, and Selker's business was the ownership, restoration and development of real property for investment purposes. (See Exhibit D of Davis Affidavit attached hereto as Exhibit 1). 2001 D.C. Stat. § 29-1017 states that, "[e]xcept to the extent that the articles of organization provide for management of a limited liability company by a manager or managers, management of a limited liability company shall be vested in its members." 2001 D.C. Stat. § 29-1019 establishes that, "[t]he articles of organization or an operating agreement of a limited liability company may delegate full or partial responsibility for managing a limited liability company to or among 1 or more managers."

Seldman's authority to execute the "day-to-day" operations of Selker included the sale of 503 Rhode Island Avenue and the sale of 1964 2nd Street. *Signal Construction Corp. v. Stanbury* confirms that, "a manager has apparent authority to do those things which managers in that business at that time and place ordinarily do." 586 A.2d 1204, 1219 (D.C. 1991). In *Signal Construction Corp.*, it was held that a project executive had implied and apparent authority to give employment reference. *Id.* at 1204. The court reasoned that an agent is "authorized to do anything which is reasonably regarded as incidental to the work specifically directed or which is usually done in connection with such work." *Id.* at 1218. As manager of Selker at that time and that place, one would have authority to sell property. Seldman was thus empowered, as the manager of Selker, to sell the 503 Rhode Island Avenue and the 1964 2nd Street properties.

Walker acknowledged and ratified Seldman's role in his December 4, 2003 letter to Seldman, sent some twenty-one (21) months <u>after</u> the sale of 503 Rhode Island Avenue, N.W. to Steed and twenty-one (21) months <u>after</u> the sale of 1964 2nd Street to Seldman. (See Exhibit 2 to Plaintiff's Second Amended Complaint). Ratification "is a matter of intention and may be express or implied ... to establish implied ratification, there must be act or conduct of principal clearly showing such intention." *Greyvan Lines v. Nesmith*, 50 A.2d 434, 437 (D.C. 1946). Ratification has been found, for example, where the employee testified that his superiors were told about and approved his actions. *Safeway Stores v. Gibson*, 118 A.2d 386, 389 (D.C. 1955).

In the letter, dated December 4, 2003, Walker recognized Seldman's role as manager prior to the date of the letter and at the time of the sale and sought to remove him from that role and replace him with Walker himself twenty (20) days later. (See Exhibit 2 to Plaintiff's Second Amended Complaint). Letters of admission are evidence of apparent authority. *See U.S. Auto Ass'n v. Alexander Film Co*, 93 A.2d 770 (1953) (holding that evidence was sufficient to show ratification of contract between plaintiff's salesman and defendant's alleged general manager, *id.* at 770). In *U.S. Auto Ass'n*, the plaintiff introduced a letter from the defendant dated approximately seven months after the date of the contract. *Id.* at 771. This letter was signed by the district manager and admitted the existence of the contracts. The court found that this letter, in itself, constituted an admission of the employee's agency. *Id.*

In his January 12, 2005 deposition testimony taken in <u>Walker v. Seldman</u>, Civil Action No. 04ca4631 (RP), pending in the Superior Court for the District of Columbia, Walker acknowledged the following: 1) that he transferred management of the LLC to Seldman by signing an amendment to the Operating Agreement dated June 7, 2001; 2) that as manager

Seldman transferred 503 Rhode Island Ave., NE; and, 3) that on December 4, 2003 Walker tried to reacquire that management role by sending a letter to Seldman.  See Walker depo. at 29 attached hereto as Exhibit 2.[3]  Walker revealed that the basis for his claim is not his legal rights as a member of an LLC but, is instead based upon his (mistaken) understanding of the rights of members of an LLC.  Walker testified that all his prior experience with corporate entities and the transfer of real property had been with corporations transferring property.  In each of these instances, the title company had required a corporate resolution to proceed with the transaction.  Walker acknowledged that he knew his attorney recommended a LLC structure because such a structure was "less onerous than a regular corporation...[i]t was my first experience with the LLC.  It's my understanding that it operates just the same as a corporation except that it's simpler for a lack of a better way of putting it."  Walker depo. attached hereto as Exhibit 2 at 28, 32.

Walker did not acknowledge the nature and extent of the power he placed into the hands of Seldman as manager of the LLC.  Specifically, Walker testified, as follows:

```
 2     Q.   Now, your understanding where it says
 3   under the management paragraph, the manager shall be
 4   responsible for the day-to-day operations of the
 5   company and for assigning the value of contributions
 6   that are not in cash such as hourly work, what does
 7   that mean in the context of how the LLC's business
 8   was conducted?
 9     A.   That means day-to-day operations, routine
10   operations.  It doesn't mean any change of assets
11   either acquisition or disposition.
12     Q.   Where does it say that, sir?
13     A.   Well, it doesn't say that, but under
14   general corporate law, as I understand it from some
```

---

[3] At the time of Walker's January 12, 2005, deposition in the D.C. Superior Court case Defendant Emrey was not a party to that lawsuit so the questioning focused on the 503 Rhode Island Avenue property owned by Defendant Andrew Steed. Nonetheless, given that the 1964 2nd Street property was sold by Selker to Seldman four days before the 503 Rhode Island Avenue property was sold by Selker to Steed, the substance of the testimony elicited from Walker pertaining to 503 Rhode Island Avenue also applies to the 1964 2nd Street transaction.

```
15  years of work experience, a corporate manager doesn't
16  do that for a corporation without authority.
17     Q.   What law are you citing?
18     A.   Well, I'm citing experience.
19     Q.   Okay.
20     A.   Normally in a corporation there's a board
21  of directors and a director has got to do resolutions
0032
 1  if you're negotiating a loan or if you're acquiring
 2  or disposing or if there's a trust involved.
 3     Q.   Does your LLC have a board of directors?
 4     A.   The LLC is different.  It was my first
 5  experience with the LLC.  It's my understanding it
 6  operates just the same as a corporation except that
 7  it's simpler for a lack of a better way of putting
 8  it.
 9     Q.   And isn't part of that simplicity that
10  managers can transfer assets without the consent of
11  the membership?  Isn't that part of its simplicity?
12     A.   Not in my mind.  If I believed that to be
13  the case, I never would have agreed to operate as an
14  LLC.  You could hire a person and they could just do
15  anything.  LLC lost money to an employee causing us
16  to have to close the LLC's accounts at First American
17  or whatever that bank --
18     Q.   Bank of America?
19     A.   -- Bank of America, yes.  So that's not
20  allowed in any scheme of business operations.
21     Q.   Wasn't the day-to-day operation of the LLC
0033
 1  to buy, renovate and sell real estate?
 2     A.   Yes, but buying and selling and renovating
 3  real estate according to law.  I mean, that didn't
 4  mean that because I was on the point that I could
 5  have taken all of the properties that were put into
 6  Selker and dispose of them and put the money in my
 7  own pocket and went ahead and say anything or
 8  acknowledge anything or report anything to Seldman,
 9  and conversely he couldn't do the same thing to me.
10  He shouldn't have anyway.
11     Q.   But you agree there's nothing in this
12  document that limits the nature of the day-to-day
13  operations of this entity?
14     A.   No.  I don't agree to that.  I mean, this
15  document basically to me says that you are to operate
16  according to law and --
17     Q.   Well, of course.
18     A.   That's commercial law and that kind of
19  governs how business is done.
20     Q.   All right.  And can you -- if we're
21  talking generally about law -- and I need to ask you
0034
 1  again.  Are there specific laws to which you are
```

```
 2  referring when you're testifying that you're relying
 3  on law?
 4     A.   I would describe what I'm relying on when
 5  I make that statement as general commercial corporate
 6  law.
```

Walker depo. attached hereto as Exhibit 2 at 31-34.

Walker's reason for concern regarding Seldman's sale of 503 Rhode Island Avenue, 1964 2nd Street and the other properties, while Seldman was the manager, seems to stem from Walker's belief that this sale did not qualify as within the "day-to-day" operations of the LLC. Walker's concern, however, is inconsistent with his own actions taken as the manager of Selker.

Walker had no problem with the power *he* wielded as manager. Walker obtained various properties for Selker including 503 Rhode Island Ave., NE (transferred to Selker from Walker himself, individually) and 1964 2nd Street. Walker consummated these acquisitions and transfers without any concern for any corporate formalities or resolutions of the members of Selker seeking to approve or ratify his actions as manager. More importantly, Walker never sought the consent or ratification of his co-member, Seldman. Specifically, Walker testified regarding his transferring his individual interest in 503 Rhode Island Ave., NE, to Selker, as follows:

```
 5     Q.   When you acquired the Rhode Island Avenue
 6  property, was there a corporate resolution?  Was
 7  there a resolution from the LLC ratifying accepting
 8  that property from you?
 9     A.   I don't understand the question.
10     Q.   You acquired Rhode Island Avenue in your
11  own name, right?
12     A.   That's what I explained.  I don't remember
13  if I did first or if it was -- if I signed the
14  contract.
15     Q.   Was there a resolution ratifying the LLC's
16  acceptance of the contract from you individually?
17     A.   Of the contract?
18     Q.   Right.  Well, the LLC would have taken
19  assignment of that contract for Rhode Island, right?
20     A.   Yes.
```

```
 21    Q.   And did you insist that a corporate
0054
 1  resolution or an LLC resolution be sworn out and
 2  notarized ratifying that the LLC was accepting this
 3  contract for Rhode Island Avenue that you had and was
 4  accepting it as the corporations or as the LLC?
 5    A.   It wouldn't have been necessary.
 6    Q.   Why wouldn't it have been necessary?
 7    A.   For the acceptance of a purchase contract,
 8  it's not ever in my experience been necessary to have
 9  a resolution to accept a contract.  Resolution comes
 10 before the purchase can be finalized with the
 11 corporation.
 12   Q.   So you did not insist that the assignment
 13 be ratified by the LLC with a resolution; is that
 14 right?
 15   A.   That's correct.
 16   Q.   And would you agree that it was consistent
 17 with the manager's power to accept assignment from
 18 L.B. Walker individually -- accept assignment of the
 19 Rhode Island Avenue contract from L.B. Walker
 20 individually to the LLC?
 21   A.   It was not an issue of the manager -- the
0055
 1  manager's responsibility was to see that the
 2  property, the documents for the property, are done
 3  and finalized properly.  That would have been a
 4  requirement of the bank's settlement company.
 5    Q.   Sure.  But at the time -- who was the --
 6  you were the manager of the LLC at the time, right?
 7    A.   Yes.
 8    Q.   And this individual L.B. Walker had a
 9  contract for the purchase of Rhode Island, correct?
 10   A.   Correct.
 11   Q.   And this entity Seldman Walker, LLC
 12 accepted assignment of that contract from the
 13 individual L.B. Walker, right?
 14   A.   Right.
 15   Q.   And would you agree that it was the LLC's
 16 manager, L.B. Walker, that acted for the LLC in
 17 accepting the contract from that individual L.B.
 18 Walker, the individual?
 19   A.   That's kind of farfetched, but if you look
 20 at the transaction, there was an underlying seller.
 21 There were maybe more than one on that property.
0056
 1         That seller had to come forward and
 2  demonstrate that they were the sellers with their
 3  driver's license or whatever at settlement,
 4  acknowledge the contract was a contract signed by
 5  them and signed by the purchaser and that passed to
 6  the settlement company.
 7    Q.   But the Seldman Walker, LLC is just a
```

```
 8  piece of paper.  There have to actually be human
 9  beings for it to manage it's day-to-day operations,
10  right?
11     A.  Um-hum.
12     Q.  And you were the manager, right?
13     A.  Um-hum.
14     Q.  Was that a yes?
15     A.  Yes.
16     Q.  So who was the human being at Seldman
17  Walker, LLC that approved the assignment of that
18  contract from the individual L.B. Walker?
19     A.  The settlement attorney.
20     Q.  No, no, no.  The assignment of that
21  contract, not the settlement of the deed.  The
0057
 1  assignment of the contract, it had to be the manager
 2  of the LLC, right?
 3     A.  If I approved it as a manager, it would
 4  have been the manager; however, as I understand the
 5  purchase and what took place, it was the settlement
 6  attorney that signed off on the docs as being
 7  complete, everything there.
 8     Q.  The deed from the seller to the assignee
 9  LLC?
10     A.  Yes.
```

Walker depo. attached hereto as Exhibit 2 at 53-57.

Walker himself defined the nature and extent of the powers the manager of Selker could and should wield in managing the "day-to-day" operations of this business.

It is apparent that the Plaintiff's concern regarding these transactions is not based on the laws relating to the operation of an LLC or even the actions of this individual LLC, but in the power it assigned to its manager. Moreover, the Plaintiff's problem is not with how the Defendants related to the LLC. The Plaintiff's problem is with the person of Neil Seldman and the discretion Mr. Seldman used in exercising the power given to him by Selker's LLC documents. Walker was specifically asked during deposition to articulate the factual and evidentiary basis upon which the he brings his claim against the Defendants. Walker testified as follows:

```
11     Q.  Let me change the question.  What
```

```
12  evidence, if any, do you have that Eastern Market
13  Title was acting under the control and direction of
14  First American with respect to this transaction?
15      A.   As a settlement company -- and I don't
16  know how the inter-relationship --
17      Q.   Well, I understand you have an
18  understanding regarding a legal relationship.  What
19  I'm asking for is what evidence do you have regarding
20   the control, the parties?  I mean, are you aware of a
21   contract they have?
0073
 1           Did someone at Eastern Market say we are
 2  working for First American or First American told us
 3  to do this when they did something?  What sort of
 4  evidence do you have in that regard?  I understand
 5  you may not have any evidence, but I'm just looking
 6  for the hard evidence that I may have to confront at
 7  trial that you will present in your case in chief.
 8      A.   Okay.  I don't know how my counsel will
 9  present it, but what I have is the evidence that this
10  happened and my knowledge is after it happened and
11  First American and all of those parties under that
12  First American umbrella had something to do in
13  something that otherwise was improper.
14      Q.   You sued Caroline Davis.  What evidence do
15  you have, if any, of any wrongdoing committed by
16  Caroline Davis with respect to you and this property?
17      A.   Okay.  My answer would have to be the same
18  as what I just gave you.
19      Q.   That you don't have any specific evidence
20   of Caroline Davis's role?  Is it true then that your
21   testimony is you don't have any specific evidence of
0074
 1  Caroline Davis's role with respect to as it relates
 2  to you and this property?
 3      A.   I believe that by the time discovery is
 4  finished and we have all of the documents and
 5  everything that's being requested that we will have.
 6      Q.   All right.  But as we sit here today on
 7  January 12, 2005 in Rockville, Maryland, what
 8  evidence does LeBon Bruce Walker himself have with
 9  respect to Caroline Davis's actions with respect to
10   this property and how Caroline Davis wronged LeBon
11  Bruce Walker?
12      A.   Everything that's been submitted to you.
13      Q.   All right.  But do you have anything else
14  to contribute of your own knowledge that's in your
15  own head regarding what she's done wrong by you,
16  facts, factual evidence?  I know that she went to
17  this meeting.  I know that she wrote this letter.  I
18  know that she told me she admitted she was guilty or
19  something like that.
20           What do you know that is factual evidence
```

11

```
21  that Caroline Davis wronged you in this transaction?
0075
 1    A.   What I told you already and what we will
 2  be giving to you subsequently.
 3    Q.   You may uncover -- you may have knowledge
 4  that you acquire in the future and I understand
 5  you're no fortune teller, you can't determine what
 6  you'll learn.
 7         But as of today, is it fair to say you
 8  have no specific evidence of your own personal
 9  knowledge -- you have no personal knowledge of any
10  actions Caroline Davis took which wronged LeBon Bruce
11  Walker with respect to the transfer of Rhode Island
12  Avenue?
13    A.   I can't say that.
14    Q.   All right.  What -- if you can't say that,
15  then what specific factual evidence does LeBon Bruce
16  Walker have with respect to what Caroline Davis did
17  that wronged him in this transaction?
18    A.   I've given you today what you described, 4
19  inches of documents, within which describes what
20  Caroline Davis, et al. did that had to do with this
21  complaint, the complaint that I've made against her
0076
 1  and First American and Eastern Market, so I can't say
 2  that I don't have any evidence.
 3    Q.   All right.  Well, I can read the documents
 4  and I know that the documents don't represent
 5  knowledge that's in your head.  I'm asking you aside
 6  from the documents that are out here -- I can take
 7  care of that.
 8         I need to know what evidence is in your
 9  head of her wrongdoing that isn't written on a piece
10  of paper on this table.  That's what I'm trying to
11  explore now because this is frankly my only
12  opportunity to find out what's in your head and not
13  on the paper.
14    A.   Well, okay.  As I sit here today, I don't
15  recollect any other information to give you.
16    Q.   All right.  As you sit here today, do you
17  have any other information -- again, the same
18  question -- in your head as to what actions Eastern
19  Market Title or any employee or individual on its
20  behalf has taken which has wronged LeBon Bruce
21  Walker?
0077
 1         Again, I understand aside from the
 2  documents out here on the table the information in
 3  your head of your own knowledge as to what Eastern
 4  Market -- what action Eastern Market may have taken
 5  that has wronged you?
 6    A.   Excepting the fact that the transaction
 7  was done and the documents and everything in front of
```

```
 8  you that are that may yet come, you have everything
 9  that we have.
10     Q.   And you have no other knowledge in your
11  head that --
12     A.   No.  I can't say I was a witness or any of
13  those examples.
14     Q.   Very good.  Same question with respect to
15  First American Title Insurance Company.  Aside from
16  the documents and what may come and what we may learn
17  from other parties, do you have any knowledge in your
18  head as to any actions First American or any on its
19  behalf, an agent, an employee, etc., has taken which
20  has wronged you in this transaction?
21     A.   Other than what we have given you or
0078
 1  what's yet to come.
```

**Walker depo. attached as Exhibit 2 at 72-78.**

Walker fails to suggest evidence which could possibly support a claim that Defendants FATIC, Emrey, Eastern Market and Davis acted inappropriately or unlawfully with respect to the transfer of 503 Rhode Island Avenue and 1964 2nd Street.  Seldman was the lawful manager of Selker, and had authority to sell the LLC's properties; all actions concerning the sale of 503 Rhode Island Avenue and 1964 2nd Street were properly executed.  Plaintiff's problems are with Neil Seldman and the propriety of the decisions he made as manager.  Plaintiff has failed to offer any evidence by which he can carry his burden of proving wrongdoing by any of the Defendants.  Defendants dealt with Seldman in his role as manager of Selker and afforded Seldman the same nature and scope of power provided and illustrated by both the LLC's formation documents and Walker's own precedent.  Plaintiff is not entitled to any relief on the substance of this claim with respect to the moving Defendants.

### III. Conclusion

**WHEREFORE**, for these reasons, Defendants respectfully request that this Court Dismiss FATIC, Emrey, Eastern Market and Davis from the above entitled action, or in the

13

alternative for entry of summary judgment in favor of FATIC, Eastern Market, Davis and Emrey, and against Plaintiff; and dismiss or enter summary judgment in the above entitled action as this action may in any way purport to affect or address the transfer of 503 Rhode Island Avenue, N.W. and 1964 2nd Street, NW, Washington, D.C. or the validity of the titles to said properties held by Steed and Emrey, respectively.

        COUNCIL, BARADEL,
        KOSMERL & NOLAN, P.A.

By:   */s/ Stephen A. Oberg*
      Michael N. Russo, Jr. (Bar No.: 07322)
      Stephen A. Oberg (Bar No.: 475925)
      125 West Street, 4th Floor
      Post Office Box 2289
      Annapolis, Maryland 21404-2289

      Annapolis: (410) 268-6600
      Baltimore: (410) 269-6190
      Washington: (301) 261-2247

*Attorneys for Defendants First American Title Insurance Company, Eastern Market Title, LLC, Carolyn Davis and Eric Emrey*

### CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on this 6th day of September, 2006, a copy of the foregoing document was mailed, first class postage prepaid, to:

Le Bon Bruce Walker
203 Seaton Place, NE
Washington, DC 20003

        */s/ Stephen A. Oberg*
        Stephen A. Oberg