
**ORIGINAL**

# Transcript of the Testimony of
## LeBon Bruce Walker

**Date:** January 12, 2005
**Volume:**

**Case:** LeBon Bruce Walker v. Neil Seldman

Phone: (410) 268-6006
Fax: (410) 268-7006
Email: corbinandhook@corbinandhook.com
Internet: www.corbinandhook.com

- *LOCATIONS* -

1831-G Forest Drive
Annapolis, Maryland

3 N. Harrison Street
Easton, Maryland


**CORBIN & HOOK**
Reporting & Videoconferencing

- *Specializing in Interactive Realtime & Rough ASCII* -

Exhibit 2

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

*Page 1*

```
 1    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
 2                      CIVIL DIVISION
 3   LEBON BRUCE WALKER, et al.,
                Plaintiffs          Case No.
 4        vs.                       04-CA-4631 (RP)
     NEIL SELDMAN, et al.,
 5              Defendants
 6   _____/
 7   NEIL SELDMAN,
                Counter-Plaintiff
 8        vs.
     LEBON BRUCE WALKER, et al.,
 9              Counter-Defendants
10              Pursuant to Notice, the deposition of
11   LEBON BRUCE WALKER was taken on Wednesday, January
12   12, 2005, commencing at 9:35 a.m., at the offices of
13   Miles & Stockbridge, 11 North Washington Street,
14   Suite 700, Rockville, Maryland 20850, before Sherry
15   L. Brooks, a Notary Public.
16
17
18
19              Corbin & Hook Reporting, Inc.
20                    P.O. Box 6239
21              Annapolis, MD  21401-9996
```

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

Page 31

1  Seldman produced.

2  Q. Now, your understanding where it says
3  under the management paragraph, the manager shall be
4  responsible for the day-to-day operations of the
5  company and for assigning the value of contributions
6  that are not in cash such as hourly work, what does
7  that mean in the context of how the LLC's business
8  was conducted?

9  A. That means day-to-day operations, routine
10 operations. It doesn't mean any change of assets
11 either acquisition or disposition.

12 Q. Where does it say that, sir?

13 A. Well, it doesn't say that, but under
14 general corporate law, as I understand it from some
15 years of work experience, a corporate manager doesn't
16 do that for a corporation without authority.

17 Q. What law are you citing?

18 A. Well, I'm citing experience.

19 Q. Okay.

20 A. Normally in a corporation there's a board
21 of directors and a director has got to do resolutions

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

Page 32

1  if you're negotiating a loan or if you're acquiring
2  or disposing or if there's a trust involved.
3      Q.   Does your LLC have a board of directors?
4      A.   The LLC is different. It was my first
5  experience with the LLC. It's my understanding it
6  operates just the same as a corporation except that
7  it's simpler for a lack of a better way of putting
8  it.
9      Q.   And isn't part of that simplicity that
10 managers can transfer assets without the consent of
11 the membership? Isn't that part of its simplicity?
12     A.   Not in my mind. If I believed that to be
13 the case, I never would have agreed to operate as an
14 LLC. You could hire a person and they could just do
15 anything. LLC lost money to an employee causing us
16 to have to close the LLC's accounts at First American
17 or whatever that bank --
18     Q.   Bank of America?
19     A.   -- Bank of America, yes. So that's not
20 allowed in any scheme of business operations.
21     Q.   Wasn't the day-to-day operation of the LLC

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

Page 33

1  to buy, renovate and sell real estate?
2      A.   Yes, but buying and selling and renovating
3  real estate according to law.  I mean, that didn't
4  mean that because I was on the point that I could
5  have taken all of the properties that were put into
6  Selker and dispose of them and put the money in my
7  own pocket and went ahead and say anything or
8  acknowledge anything or report anything to Seldman,
9  and conversely he couldn't do the same thing to me.
10 He shouldn't have anyway.
11     Q.   But you agree there's nothing in this
12 document that limits the nature of the day-to-day
13 operations of this entity?
14     A.   No.  I don't agree to that.  I mean, this
15 document basically to me says that you are to operate
16 according to law and --
17     Q.   Well, of course.
18     A.   That's commercial law and that kind of
19 governs how business is done.
20     Q.   All right.  And can you -- if we're
21 talking generally about law -- and I need to ask you

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

Page 34

1  again.  Are there specific laws to which you are
2  referring when you're testifying that you're relying
3  on law?
4      A.   I would describe what I'm relying on when
5  I make that statement as general commercial corporate
6  law.
7      Q.   In the District of Columbia?
8      A.   Um-hum.  I know that for corporate assets,
9  corporate borrowings, you have to have resolutions
10 when you borrow, you have to produce a resolution
11 when you're selling.  At least everything that I've
12 ever done over some years experience required that,
13 so I was simply going on the basis of my own
14 experience.
15     Q.   And your experience was always with
16 corporations, right?
17     A.   Both corporations and individual.
18     Q.   But not with LLC?
19     A.   Not with LLC.
20     Q.   And isn't it true that what you're talking
21 about as far as the requirements of corporate law

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

*Page 53*

1  requested and had been requesting right along --

2            MR. SULLIVAN: Prior to litigation?

3            THE WITNESS: Yes.

4  BY MR. RUSSO:

5       Q.   When you acquired the Rhode Island Avenue

6  property, was there a corporate resolution?  Was

7  there a resolution from the LLC ratifying accepting

8  that property from you?

9       A.   I don't understand the question.

10      Q.   You acquired Rhode Island Avenue in your

11 own name, right?

12      A.   That's what I explained.  I don't remember

13 if I did first or if it was -- if I signed the

14 contract.

15      Q.   Was there a resolution ratifying the LLC's

16 acceptance of the contract from you individually?

17      A.   Of the contract?

18      Q.   Right.  Well, the LLC would have taken

19 assignment of that contract for Rhode Island, right?

20      A.   Yes.

21      Q.   And did you insist that a corporate

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

Page 54

1  resolution or an LLC resolution be sworn out and
2  notarized ratifying that the LLC was accepting this
3  contract for Rhode Island Avenue that you had and was
4  accepting it as the corporations or as the LLC?
5      A.   It wouldn't have been necessary.
6      Q.   Why wouldn't it have been necessary?
7      A.   For the acceptance of a purchase contract,
8  it's not ever in my experience been necessary to have
9  a resolution to accept a contract.  Resolution comes
10 before the purchase can be finalized with the
11 corporation.
12     Q.   So you did not insist that the assignment
13 be ratified by the LLC with a resolution; is that
14 right?
15     A.   That's correct.
16     Q.   And would you agree that it was consistent
17 with the manager's power to accept assignment from
18 L.B. Walker individually -- accept assignment of the
19 Rhode Island Avenue contract from L.B. Walker
20 individually to the LLC?
21     A.   It was not an issue of the manager -- the

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

Page 55

1  manager's responsibility was to see that the
2  property, the documents for the property, are done
3  and finalized properly. That would have been a
4  requirement of the bank's settlement company.
5      Q.   Sure. But at the time -- who was the --
6  you were the manager of the LLC at the time, right?
7      A.   Yes.
8      Q.   And this individual L.B. Walker had a
9  contract for the purchase of Rhode Island, correct?
10     A.   Correct.
11     Q.   And this entity Seldman Walker, LLC
12  accepted assignment of that contract from the
13  individual L.B. Walker, right?
14     A.   Right.
15     Q.   And would you agree that it was the LLC's
16  manager, L.B. Walker, that acted for the LLC in
17  accepting the contract from that individual L.B.
18  Walker, the individual?
19     A.   That's kind of farfetched, but if you look
20  at the transaction, there was an underlying seller.
21  There were maybe more than one on that property.

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

Page 56

1          That seller had to come forward and
2 demonstrate that they were the sellers with their
3 driver's license or whatever at settlement,
4 acknowledge the contract was a contract signed by
5 them and signed by the purchaser and that passed to
6 the settlement company.
7       Q.    But the Seldman Walker, LLC is just a
8 piece of paper. There have to actually be human
9 beings for it to manage it's day-to-day operations,
10 right?
11       A.    Um-hum.
12       Q.    And you were the manager, right?
13       A.    Um-hum.
14       Q.    Was that a yes?
15       A.    Yes.
16       Q.    So who was the human being at Seldman
17 Walker, LLC that approved the assignment of that
18 contract from the individual L.B. Walker?
19       A.    The settlement attorney.
20       Q.    No, no, no. The assignment of that
21 contract, not the settlement of the deed. The

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

Page 57

1  assignment of the contract, it had to be the manager
2  of the LLC, right?
3       A.   If I approved it as a manager, it would
4  have been the manager; however, as I understand the
5  purchase and what took place, it was the settlement
6  attorney that signed off on the docs as being
7  complete, everything there.
8       Q.   The deed from the seller to the assignee
9  LLC?
10      A.   Yes.
11      Q.   Okay. I think we're -- I'm comfortable
12 with --
13      A.   I'm not trying to --
14      Q.   I understand. We're just talking around
15 each other and I think I understand where we are.
16           MR. RUSSO: Can I get this exhibit marked,
17 please?
18           THE REPORTER: Yes.
19                        (Exhibit 4 marked.)
20 BY MR. RUSSO:
21      Q.   I'm going to show you what's been marked

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

Page 72

1   -- that First American should be responsible for the

2   actions of Eastern Market Title with respect to the

3   Rhode Island Avenue property, that they are somehow

4   -- Eastern Market -- that Eastern Market is somehow

5   First American's agent or employee or servant in a

6   master servant relationship with respect to the

7   transaction?

8       A.   That's a very technical kind of question.

9   I think I would have to refer to counsel for an

10  explanation.

11      Q.   Let me change the question.  What

12  evidence, if any, do you have that Eastern Market

13  Title was acting under the control and direction of

14  First American with respect to this transaction?

15      A.   As a settlement company -- and I don't

16  know how the inter-relationship --

17      Q.   Well, I understand you have an

18  understanding regarding a legal relationship.  What

19  I'm asking for is what evidence do you have regarding

20  the control, the parties?  I mean, are you aware of a

21  contract they have?

1    Did someone at Eastern Market say we are
2  working for First American or First American told us
3  to do this when they did something?  What sort of
4  evidence do you have in that regard?  I understand
5  you may not have any evidence, but I'm just looking
6  for the hard evidence that I may have to confront at
7  trial that you will present in your case in chief.
8        A.    Okay.  I don't know how my counsel will
9  present it, but what I have is the evidence that this
10 happened and my knowledge is after it happened and
11 First American and all of those parties under that
12 First American umbrella had something to do in
13 something that otherwise was improper.
14       Q.    You sued Caroline Davis.  What evidence do
15 you have, if any, of any wrongdoing committed by
16 Caroline Davis with respect to you and this property?
17       A.    Okay.  My answer would have to be the same
18 as what I just gave you.
19       Q.    That you don't have any specific evidence
20 of Caroline Davis's role?  Is it true then that your
21 testimony is you don't have any specific evidence of

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

*Page 74*

1  Caroline Davis's role with respect to as it relates
2  to you and this property?
3     A.   I believe that by the time discovery is
4  finished and we have all of the documents and
5  everything that's being requested that we will have.
6     Q.   All right.  But as we sit here today on
7  January 12, 2005 in Rockville, Maryland, what
8  evidence does LeBon Bruce Walker himself have with
9  respect to Caroline Davis's actions with respect to
10 this property and how Caroline Davis wronged LeBon
11 Bruce Walker?
12    A.   Everything that's been submitted to you.
13    Q.   All right.  But do you have anything else
14 to contribute of your own knowledge that's in your
15 own head regarding what she's done wrong by you,
16 facts, factual evidence?  I know that she went to
17 this meeting.  I know that she wrote this letter.  I
18 know that she told me she admitted she was guilty or
19 something like that.
20         What do you know that is factual evidence
21 that Caroline Davis wronged you in this transaction?

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

Page 75

1  A.  What I told you already and what we will
2  be giving to you subsequently.
3  Q.  You may uncover -- you may have knowledge
4  that you acquire in the future and I understand
5  you're no fortune teller, you can't determine what
6  you'll learn.
7      But as of today, is it fair to say you
8  have no specific evidence of your own personal
9  knowledge -- you have no personal knowledge of any
10 actions Caroline Davis took which wronged LeBon Bruce
11 Walker with respect to the transfer of Rhode Island
12 Avenue?
13 A.  I can't say that.
14 Q.  All right.  What -- if you can't say that,
15 then what specific factual evidence does LeBon Bruce
16 Walker have with respect to what Caroline Davis did
17 that wronged him in this transaction?
18 A.  I've given you today what you described, 4
19 inches of documents, within which describes what
20 Caroline Davis, et al. did that had to do with this
21 complaint, the complaint that I've made against her

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

*Page 76*

1  and First American and Eastern Market, so I can't say
2  that I don't have any evidence.
3      Q.   All right.  Well, I can read the documents
4  and I know that the documents don't represent
5  knowledge that's in your head.  I'm asking you aside
6  from the documents that are out here -- I can take
7  care of that.
8           I need to know what evidence is in your
9  head of her wrongdoing that isn't written on a piece
10  of paper on this table.  That's what I'm trying to
11  explore now because this is frankly my only
12  opportunity to find out what's in your head and not
13  on the paper.
14      A.   Well, okay.  As I sit here today, I don't
15  recollect any other information to give you.
16      Q.   All right.  As you sit here today, do you
17  have any other information -- again, the same
18  question -- in your head as to what actions Eastern
19  Market Title or any employee or individual on its
20  behalf has taken which has wronged LeBon Bruce
21  Walker?

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

Page 77

1    Again, I understand aside from the
2  documents out here on the table the information in
3  your head of your own knowledge as to what Eastern
4  Market -- what action Eastern Market may have taken
5  that has wronged you?
6    A.  Excepting the fact that the transaction
7  was done and the documents and everything in front of
8  you that are that may yet come, you have everything
9  that we have.
10   Q.  And you have no other knowledge in your
11 head that --
12   A.  No.  I can't say I was a witness or any of
13 those examples.
14   Q.  Very good.  Same question with respect to
15 First American Title Insurance Company.  Aside from
16 the documents and what may come and what we may learn
17 from other parties, do you have any knowledge in your
18 head as to any actions First American or any on its
19 behalf, an agent, an employee, etc., has taken which
20 has wronged you in this transaction?
21   A.  Other than what we have given you or

*Deposition of LeBon Bruce Walker*
*Taken on January 12, 2005*

Page 78

1  what's yet to come.
2  Q. Who is Milton Green?
3  A. A senior vice president at D.C. First
4  National Bank.
5  Q. And where is his office located?
6  A. 14th Street, Northwest.
7  Q. Do you have his phone number?
8  A. No, not at hand.
9  Q. When was the last time you spoke with Mr.
10 Green?
11 A. 2001.
12 Q. And what did you speak -- did you have a
13 business relationship with Mr. Green?
14 A. With the bank for whom he works.
15 Q. Was Mr. Green familiar with the LLC's
16 account of the -- with the LLC's account and business
17 dealings with the bank?
18 A. Yes.
19 Q. What was his relationship to the LLC?
20 A. Mr. Green as a senior loan officer is the
21 officer that processed and approved the line of